Our fifth case this morning is Leeper v. Alliance Resource Partners Tom Rosenfeld v. Alliance Resource Partners This case involves interpretation of the Workers' Adjustment and Retraining Notification Act, the WARN Act. This is an appeal from the District Court's grant of defendant's motion for summary judgment, and the standard of review is de novo. Defendants' summary judgment movements bear the burden of establishing that there are no genuine issues of material effect. The District Court below found that 60-day advance notice to employees was not required under the WARN Act based on two findings. First, it held that employment termination does not occur under the Act if the terminated worker is rehired within six months. Second, the Court held that a reduction of hours of work of more than 50% under the Act does not include months in which employees' hours are reduced to zero. The Court's legal conclusions were air and should be reversed for two reasons. First, the Court's statutory interpretation ignores the plain language and the purpose of the Act and requires adding conditions and language to each of the two relevant provisions at issue. Second, the decision results in the elimination of a bright-line test and leads to a confusing, backward-looking analysis that opens the door to abuse and manipulation. The WARN Act provides that any one of three events constitutes an employment loss triggering the notice requirements, and any one is the language of this Court. One, an employment termination under A. B, a layoff exceeding six months. And C, a reduction of hours of work of more than 50% during each month of any six-month period. In phase I, the Seventh Circuit made clear that an employment loss occurs when any one of the subsections apply. Judge Easterbrook wrote, and it is enough that 2101A6A is satisfied. Iridium supplied the District Court with elaborate calculations demonstrating that 2101A6C was not. But what of it? An employment loss occurs when any one of the subsections applies. This opinion of the Seventh Circuit, which is dealt severely with WARN Act cases, furthers the purpose of the Act, which has been described as a wage worker's equivalent of business interruption insurance. It protects a worker from being told on payday that the plant's going to close that afternoon and his income is shut off, though he has to buy groceries for his family that weekend and make a mortgage payment the next week. That's a quote from the Ninth Circuit's opinion in Cowens. On February 5, 2016, the defendant delivered a notice, delivered a letter to 182 of its workers at its Hamilton mine stating that starting at midnight that night, their employment was over, their benefits were done, their wages were done. No more insurance, can't go to the clinic, they're out. The letter that they received did not use the phrase temporary layoff, but did not state that defendants expected to recall any of them. The letter mentioned that the employees were at will and simply said that employees may return on August 1, 2016, five months and 24 days later. The letter came with a packet explaining that defendants were treating the event as a termination of employment. That word is throughout the packet. In fact, the defendants exclusively applied their termination procedures to this employment action. They did not apply any layoff procedures. For instance, the most obvious, the defendants withheld from the plaintiff's last paycheck about a quarter of a million dollars, $200,000 worth of advances that had been made that the defendants, by their own contractual language, were only entitled to recover if there was a resignation or termination. Is that like getting a full payment deferred? Your Honor, I believe the advances were made by the defendants when the defendants bought the mine the year before. And they made advances under an advance agreement with the miners. And the advance agreement says, you don't have to pay this back until we terminate you or you resign. On February 5, 2016... So you have something to live on now? Yes, Your Honor. They unilaterally pulled that money out of their paycheck. We believe that the application, the application exclusively of the termination policies by the defendants' evidence created a reasonable... created to the reasonable employee the understanding that they were in fact terminated. It is also undisputed that... Excuse me. On August 1, five months and 24 days later, the employer brought back less than 50% of the employees. It's undisputed that 182 of the employees, including the folks who came back for that last week before the six-month timeline on layoff wore down. It's undisputed that 137 of the employees had a reduction of hours of greater than 50% for six consecutive months, which is provided under the Act. The claims we advance are that under 21016A, all 182 of the folks at the meeting, including the packet recipients, suffered termination on that day because based on the package itself and the application by the employer of the termination policies, they lacked a reasonable expectation of recall. They understood they lacked a reasonable expectation of recall, which is the statutory and regulatory language at issue. Number two... Is there a difference between a recall and a rehiring? No. Because I guess you're saying they were terminated, but some came back. We are saying that on 2516, at that time, the action at that time was a termination. And the fact, the mere fact that five months and 24 days later, some were rehired, does not instruct us as to whether or not there was a termination at the time. The standard, the objective standard used in the regulations and the statute to determine whether an employee is still an employee is whether that employee, the objective standard is whether that employee had a reasonable expectancy of recall. And we're saying on that day they did not. The fact that some later on did come back does not alter the objective standard to be used at the time. I guess you're saying they were not laid off, they were fired. We are saying they were fired on that day. And the district court held that because some of them were rehired within six months, that in fact back on 25, they weren't fired. And that's a backward, that opinion... You're saying the district court contradicted herself? At one point she said they were fired, at another point she said they were not fired? The district court said on page 10 of the order, conceded that the court must first address whether the employee suffered a termination or a layoff. If the court finds the undisputed facts show that the employment loss was a termination, then the termination was effective as of February 6th, and it affected all 158 full-time employees, and the subsequent rehire does not change that conclusion. That's what she said on page 10. She said if, I guess. If the court finds. If the court finds, correct. These were cross motions. The court then, two pages later, disregarded its own instruction and ruled following an Eighth Circuit case that an employee cannot be terminated if he or she returned to work within six months. So what the court did was apply a six-month waiting period under 2101A6A, the termination piece, and applied a six-month waiting period to determine whether or not you are employed, whether or not you are terminated. Now Congress knew how to do six-month waiting periods because Congress put a six-month time frame in subsection B for layoffs, and it put a six-month time frame in subsection C for reduction of hours. But subsection A just says terminate. An employment loss equals an employment termination. There's no six months. We don't wait six months to determine whether or not we were fired, and that's the flaw with this court's opinion as to the termination claim. Well, the fact that there's no question 80 people were fired ultimately, right? Your Honor, in our view, there's no question 182 were fired. But the court does—it's interesting. It's a really interesting question. The court doesn't say—what the court says is the folks who got brought back five months and 24 days later, those folks were not terminated, and because those folks weren't terminated, it brought the number under the statutorily required 33%. The court doesn't speak to what the return of the people who did return, the re-hire of those people, what that meant in terms of whether the other folks who were not asked to come back, whether they were in fact terminated. It's silent about that. Our view is leave the statute alone. Judge Easterbrook has been just—this circuit is so clear that this is a bright-line test, the statute. It's not to be played with. It's not to be massaged. The Faison case is so instructive, and it says, the Warren Act does not require employees to take business risks. This is Judge Easterbrook. Employees' entitlement depend on events as they are rather than as employers hope they turn out. On February 5, 2016, when they get to notice and the policies are invoked, that's when we have to determine whether that's a termination. We don't wait and hope and pray that maybe we get rehired, and if we get rehired, then it turns out that wasn't a termination. The statute doesn't say that. Don't change the statute. Well, even on that interpretation of the statute, just a straightforward interpretation that we make the assessment about whether this is a termination or a layoff, and the Department of Labor regulations draw a distinction for purposes of applying those terms between a permanent cessation of employment, of the employment relationship, which is a termination, and a temporary cessation of that relationship, which is a layoff. So using that regulatory guidance and the language of the statute and looking to the actual communications that the employees were given in the form of the letter and the frequently asked questions, why does this constitute a permanent cessation of the employee relationship when they're being told that they can return in less than six months? Well, that's the heart of it. That's the heart of it. When is the permanency? Do we wait six months, eight months? I'm not talking about waiting to see what happens. I'm talking about what is the substance of the communication objectively that was given to these employees. This is not a permanent cessation because you may return on this date, August 1st. So it's not permanent. That is exactly the issue, and that is exactly the analysis that should have been done below. I understand that. So if we do that analysis, why isn't this temporary? Because they're being told to come back on August 1st. Because the regs, the statute itself, 2101A5, tells us who should get notice, who are affected employees, and they define affected employees as employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plan closing. The regulation 630 CFR 639.3 tells us how you count, who's included. It says workers on a temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. Okay, this doesn't involve counting. I know everybody's obsessed with counting here. Let's just assume that all 100 and however many it was got these communications. Based on what's in these communications, was this temporary or permanent? This was reasonably understood, objectively reasonably understood by the employees to be permanent. Even though they're being told come back on August 1st. They don't say that. That's what it says. It says you may be recalled on August 1st. No, it says you may return. You may. In other words, come back on August 1st. That's not the way. Based on what's in the documents, not any parole evidence. What's in the documents. You may come back on August 1st. So it's temporary. It's not permanent. You have a job on August 1st. That's not what that says. That's what it says. You may return. It doesn't say you will. And the regulation 639.3, Your Honor, says. It doesn't say we may rehire you. It says you may return. Your Honor. That's a temporary layoff. It's not a permanent cessation of the employee relationship. Saying you still have a job here on August 1st. That's not what that says. You may return. Come back to work that day. The statute tells us who we include. The statute says who should get notice. The dispute here is not over who should get a notice. Nobody got the notice. The dispute is whether the employee who received those documents had a reasonable expectation that they would be returning. Whether an objective reader would understand this to be temporary or permanent if they're being told come back on August 1st. Right. And there's a myriad of factors, including that language, which is may not will. The regulation says will be recalled. That's when you have a. . . It doesn't speak in recall terms. It says you may return on August 1st. Every one of the people who got this letter could show up on August 1st, according to the terms of the letter. Well, that's not what happened. Well, we don't look at it based on what happened after the fact. I agree. We look at it based on what's in this document. And this document is structured as a temporary layoff by its language and terms. The issue is whether a reasonable employee would understand the language you're looking at and the invocation of the termination policies is precisely what you're saying, whether they would understand that they were terminated. We believe the facts are undisputed. They invoke no layoff policies. They didn't use the regulatory language that you will be recalled. It says you may be brought back. It doesn't say you may be recalled. It says you may return. That's materially different language. It's not a hedge. The employer also withdrew $200,000 in funds from employees. . . For the layoff period. No. No. Advances from before that they were only entitled to if you were terminated or if you resigned. The employer also paid accrued vacation, which you only do on termination. Every single policy the employer did in the FAQs that came with that letter was a termination policy. The defense they've made in this is we didn't have layoff policies. Bingo. What was the number? 182 people received the packet. 137 of the employees did not work less than 50 hours. Are you saying that the whole number got their advance back at that time? Not everybody, but everyone who got it in advance, their money was withdrawn. The advance had occurred a year earlier. At that time, anyone who had previously received an advance, that money was pulled out of their final paycheck unilaterally. Our view is if you're coming back, why are they invoking termination policies and why are they sucking a quarter of a million dollars out of your bank accounts? Why are they saying you can't use the clinic? Why are they cutting off your insurance? Why are they paying you accrued vacation? And if you are coming back, why don't they say— You're doing that for all 150 or whatever it was? Yes, Your Honor. 182 received the notice. 182? Yes, Your Honor. Then I guess my problem is foresight and hindsight, and that's why I admit I'm pretty confused by this. Well, Your Honor, that's exactly right. We think the district court used hindsight going out and saying these folks got rehired, and so therefore back then they were terminated. The court didn't do the analysis, didn't do the thinking and expression that you all are doing here today and that we want you to do because the objective standard is in the regs and it's in the statute. I see I'm blowing over my time. I wanted to reserve time, but I didn't get the second. That's fine. I'll give you extra time. We kept you at the podium. Should I leave? If you're done now, then we'll— Well, I'd like to talk about the second piece, which is the reduction of hours, but again, I don't want to— That's month by month, right? That's the subsection C requires notice if to employees who suffer a greater than 50% reduction of hours in six consecutive months. That clearly happened here. The bottom line is that the court found that greater than 50% doesn't mean 100%, so months in which employees suffer a zero, get a zero or are taken out of zero, that doesn't count, and so the subsection C does not apply. That's the Ainsworth case they found. It's a district court case. There's no circuit court case on this. This would completely gut C application of that. If we alter the language of subsection C to change it from greater than 50% to greater than 50% but not 100%, you won't have C anymore. It'll be gone. Right, but your interpretation makes the first two subsections superfluous because every layoff and termination would be a loss of 50% of hours for a month, so your interpretation is also unsound. So these have to be three distinct categories of actions. Otherwise, the statute doesn't make any sense, but I'll give you time in rebuttal. Okay, thank you very much, Your Honor. Good morning, and may it please the court. My name is Richard Griffith, and I'm counsel for the Appellees in this case. We ask the court to affirm the district court's decision and hold, as the district court did, that under the Warren Act, the Hamilton workers who returned to work fewer than six months after the announcement of a temporary layoff did not experience an employment termination under the Act, and second related ruling, Hamilton workers who returned to work fewer than six months after the announcement of a temporary layoff also did not experience an employment loss under the reduction of hours prong of the Act. We believe the court correctly applied the text of the Warren Act, decided to take the case consistent with the purposes of the Act, and correctly declined to apply the so-called reasonable test that Mr. Rosenfeld referred to, which is not a recognized test at all and which is not supported by the regs or the statutes. Judge Sykes, you had the letter, and so I know this is part of the record, but I think I haven't heard these words mentioned so far, and so I just think it's really important for all of us to remember as we consider this case that the regarding section of the letter in question, which is a one-page letter, is, quote, temporary layoff notice, regarding temporary layoff notice, and one of the first sentences in the letter is, quote, I regret to inform you that due to operational considerations, Hamilton is placing you on temporary layoff for the period commencing on 2-6-16 and ending on 8-1-16. How many got that letter? I'm sorry? How many employees got that letter? Well, 182 received it, but the numbers that we've really been using as this case got honed at the district court level is 158. That's how many full-time employees received the letter, and then ultimately 61 people returned to work, and the balance did not, but within four days of the receipt of the temporary layoff notice, workers were already returning. Right, but we don't measure compliance with the Warren Act from the standpoint of how many later returned or found work. That's the import of the Faison case. We look to the situation as it existed at the time of the communication from the employer in order to characterize whether this was temporary or permanent. The regulations say that, or the guidance from DOL says that a termination is a permanent cessation, a layoff is a temporary cessation, and to make that determination, we don't evaluate how many eventually regained their jobs. May I speak to that, Judge? Yes, that's not a sound interpretation of the statute according to our case law. And I just would respectfully disagree with that reading. And so what Faison dealt with was an absolute, unquestionable termination at the moment that the decision was made to close that facility. No, I know that was a plant closing case or an employment termination case that occurred in that context, and the fact was the employees didn't regain employment at that employer. They found other work, right? Correct. And so that's definitely the fact pattern there, but the interpretive principle about what our frame of reference is, our temporal frame of reference is we're looking at the content and substance of the communication that these employees were given about the nature of this employment action in order to characterize it. We can't characterize it based on hindsight in terms of what happened six months later or five days later or three months later. And so what I would say is our position is slightly different from that, which is that with regard to a termination, as you had in Faison, as you could have in any case where there is not a temporary layoff notice like we had here, not a statement that you're going to be temporarily laid off for a period, but a termination. Of course, at that moment, that is the decision. And that's really the theory that the appellant has here is that that's how we look at this. Was that letter an absolute termination? But the uniform case law is that where it is a temporary layoff, you do look at what happened. You look at the actuality of the termination. And so if you look at the Rifkin case, the Nelson case, the Foster case, all three of those cases include that language about layoffs. We were unable to find, have been unable to find, a case anywhere, ever, where there was an announced temporary layoff. Folks came back within six months, at least the number so that there wouldn't be a required notice, and yet the court analyzed the layoff at the moment of the notice. What you do is you look at that actuality of termination. Now, if it turns out that as the facts evolve, it can affect the numbers, but in fact with the temporary layoff, because you'll never know if it's going to be more or fewer than six months. Well, right, but the whole regulatory requirement here that the WARN Act implements or puts in place is that there has to be 60 days notice. So everybody has to know at that moment of the communication being delivered, the pink slips coming, how to characterize that employment action in order to determine whether there's a WARN Act violation. We don't make those determinations long after the fact. How can the employer know whether he has to give the notice if that determination has to wait to see how many people are recalled or ultimately brought back to work? The employer can't even know. The employer is the one with the regulatory obligation to give the 60 days notice. That's right, and if it turns out that it's a temporary layoff that extends beyond six months, I'm not saying that an employer couldn't find itself to have then be determined to have been in violation of the WARN Act. What I'm saying is all the law, there is no law that we're aware of, not a case anywhere, that stands for the proposition where it's an announced temporary layoff, and then the actuality of it is that people come back, as they did here, that nevertheless you look at whether that was a WARN Act notice event at the date of the notice. In every case involving an announced layoff, it is the case that you look at the actuality of the termination, and that's the language. That's the language in Rifkin. In fact, in Rifkin, the Eighth Circuit, the facts were that the employer actually said, we expect this to be permanent, and nevertheless the court found that when people came back, they had not experienced an employment loss. Now, you used the term announced temporary layoff. Yes, sir. To put all that together, it's announced that this is going to be temporary? Is that what your position is? Yes, and it ties in. So that it's not a termination? It is not a termination. There are three sections, as Judge Sice mentioned earlier. There are three sections that relate to employment loss. One is an out-and-out termination. One is a layoff that lasts fewer than six months. And the other is the reduction of hours prong of it. So is announced temporary mean less than six months? So a layoff, the language in the employment loss section is a layoff lasting fewer than six months. But there's also another part of the Warren Act, 2102C, that contemplates that there are certain circumstances related to sort of business distress where you could actually have a layoff that goes longer than six months and it still not be a Warren notice event. The point, though, is that that statute, 2102C, by clear implication, establishes that if it's a layoff of fewer than six months, then there isn't a notice obligation. So, yes, that is our position, that if it's a layoff of fewer than six months. At the outset is what I'm referring to. Right, and so if it's announced to be a temporary layoff, and, again, if you look at 2102C, it makes it clear. If it's announced to be a temporary layoff, then it is. Now, if it turns out that it goes longer, then that becomes a Warren event. But at the moment of the inception, the one thing that you can determine is, has there been an employment termination? And in Phazon there was, but in all the cases we've seen from multiple circuits where there is an announced temporary layoff, and when you use language like this, there's selective references in the appellant's brief to statements in the frequently asked questions. For example, this is a termination. It doesn't say this is a termination. It says this is a termination for purposes of wages and benefits. So if you're on a layoff, you're not making wages, and you're not on the benefit plans. But in every way that the company could, it communicated that this was a temporary layoff and that it was expected to last fewer than six months. So it's only after six months that Warren is implicated? You would be able to, you could then determine. Now, things can happen, and it really dovetails with this hours argument. On this question of temporary layoff and when you make that determination, as I said before, there is an absence to our knowledge of any judicial support for their position. And this test that they've talked about, the regulations they've talked about, don't actually deal with what's at issue here, which is was there a termination or was there an employment loss. Instead it deals with whether somebody is an employee for counting whether an entity is an employer. It's inact. It's not on point with what we're talking about. But there likewise is no support anywhere that we have found for the argument in support of this hours argument. There is the Ainsworth case from Minnesota, which is directly on point. It is conceded to be on point, and it goes against them. And the point of it, to Judge Sykes' point, is that it would make subpart B, the temporary layoff section, completely obliterated. In fact, would change it so that any temporary layoff of five-and-a-half months or fewer would apply. It basically would, because at five-and-a-half months, if you have a layoff, temporary layoff, and it goes five-and-a-half months and one hour more, then you necessarily would meet the hours requirement. So you could not, it would read out of the statute the temporary layoff section. Right. These are three separate categories of employment actions. Precisely. And the straightforward first-tier analysis is what's in the documents themselves, the letter and the frequently asked questions. And do the terms of those documents qualify this as a permanent cessation of the employment relationship, to use the language of the regulatory guidance, or a temporary cessation? Exactly. And what is the duration on the face of these documents? And the duration is less than six months. And that's the end of the inquiry, unless, given the facts on the ground, the temporary cessation ripened into one that was permanent by some development later. Right. I agree with that. But not the other way around. I agree with that. And, you know, I think the way that you've characterized that letter is aligned with our position entirely, as I was listening to the question earlier. And on the hours question, it's simply, you can't really make sense of the statutory scheme, I can't, that there are three subparts that each address different circumstances. One would be an out-and-out termination at the inception. Another would be a temporary layoff lasting fewer than six months. And the third would be, basically, if you reduce someone's hours enough that it makes it untenable for them. And what the drafters concluded was, if it goes below 50 percent for six to eight months, you have effectively caused them an employment loss. That's the idea. I'm seeing that I don't have a lot of time left, but I do want to make sure that I address everything that the court would want. Of course, if there are any other questions, please let me know. Apparently not. Okay. Just to close, thank you. Thank you for the questions. I appreciate them. To reiterate the point about the lack of judicial support for the position, as I said before, one of the principal arguments advanced is that there is some need for some sort of reasonable expectation test. The case that that is based on is from a district court in another area of the country, but it doesn't support that anyway. The regulation cited doesn't support this anyway. And, in fact, we have a case, the Smith case from the Western District of Virginia, that addresses this exact issue, which is that an employment loss is something different from how you determine whether someone is an employee for purposes of the size of the employer. So for all the reasons stated, including the fact that there's no judicial support for the other side's position, we would ask that the district court's decision be affirmed. All right. Thank you. Mr. Rosenfeld, your time has expired, but I'll give you another minute if you have something else to say in rebuttal. I appreciate that, because I could go over it, obviously. I do want to talk about the reduction of hours prong, subsection C. It is a separate prong. It is left alone. It covers this situation. There's no issue of fact that it covers this situation, and it does address different scenarios than a layoff. For instance, if defendants were to do a temporary layoff, a layoff of six months or less, six months, five months, and three weeks, for instance, our view is, under the clear language of subsection C, there's been a reduction of hours of greater than 60% to 50%. Folks are entitled to notice. If then, as you point out, Your Honor, things evolve, and now there's going to be an extended layoff, you need a new notice. That's what graphic communication says. There's a separate employment loss, a new employment loss. If there's a plant closing, like graphic communication, you need a new notice. The statute allows for multiple employment losses triggered by multiple notice obligations at different times. Now, the sin of C that we're dealing with is it's accused of being, our argument's accused of it being superfluous or redundant. The Supreme Court has over and over and over dealt with the issue of superfluous language and said over and over, there's got to be an alternative. If we're going to damn statutory language for being superfluous, we've got to have a better alternative. The alternative that Ainsworth and the District Court have done, and defendants are advancing, would simply end C. You'd never, because you could simply intersperse with low-hour months, zero-months hours, periodically. You could set people out for low months, and every five or six months, say, stay home that month. You'd never have a claim. There's a reason our case is novel. And the reason it's novel is because the statutory language is so crystal clear, no one's doing this. All right, thank you. Thank you so much. Thank you for the extra time. Our thanks to all counsel. The case is taken under advisement.